# EXHIBIT A

# Supreme Court of Pennsylvania
## Court of Common Pleas
## Civil Cover Sheet
ALLEGHENY **County**

| For Prothonotary Use Only: | |
|---|---|
| Docket No: | TIME STAMP |

*The information collected on this form is used solely for court administration purposes.  This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

## SECTION A

**Commencement of Action:**
- ☒ Complaint
- ☐ Writ of Summons
- ☐ Petition
- ☐ Transfer from Another Jurisdiction
- ☐ Declaration of Taking

| Lead Plaintiff's Name: | Lead Defendant's Name: |
|---|---|
| Natalie Pierce | Klover Holdings, Inc. |

**Are money damages requested?** ☒ Yes  ☐ No

Dollar Amount Requested: (check one)
- ☐ within arbitration limits
- ☒ outside arbitration limits

**Is this a _Class Action Suit_?** ☒ Yes  ☐ No       **Is this an _MDJ Appeal_?** ☐ Yes  ☒ No

Name of Plaintiff/Appellant's Attorney:  Kevin Abramowicz

☐ **Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)**

## SECTION B

**Nature of the Case:**   Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE**.  If you are making more than one type of claim, check the one that you consider most important.

**TORT** *(do not include Mass Tort)*
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability *(does not include mass tort)*
- ☐ Slander/Libel/ Defamation
- ☒ Other:
  _____

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other:
  _____

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional:
  _____

**CONTRACT** *(do not include Judgments)*
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other
  _____
  _____
- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other
  _____
  _____
- ☐ Other:
  _____
  _____

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other:
  _____

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other
  _____
  _____
- ☐ Zoning Board
- ☐ Other:
  _____

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other:
  _____

*Updated 1/1/2011*

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| NATALIE PIERCE and MICHELLE INGRODI, individually and on behalf of all others similarly situated, | CIVIL DIVISION |
| | No. |
| Plaintiffs, | CLASS ACTION |
| | **CLASS ACTION COMPLAINT** |
| v. | |
| KLOVER HOLDINGS, INC., | |
| Defendant. | |

Filed on behalf of Plaintiffs:
Natalie Pierce and Michelle Ingrodi

Counsel of record for Plaintiff:

Kevin Abramowicz
Kevin W. Tucker
Chandler Steiger
Stephanie Moore
**East End Trial Group LLC**
6901 Lynn Way, Suite 215
Pittsburgh, PA 15208
Tel: (412) 223-5740
Fax: (412) 626-7101
kabramowicz@eastendtrialgroup.com
ktucker@eastendtrialgroup.com
csteiger@eastendtrialgroup.com
smoore@eastendtrialgroup.com

*Attorneys for Plaintiffs*

## IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| NATALIE PIERCE and MICHELLE INGRODI, individually and on behalf of all others similarly situated, | CIVIL DIVISION |
| | No. |
| Plaintiffs, | CLASS ACTION |
| v. | |
| KLOVER HOLDING'S, INC., | |
| Defendant. | |

### <u>NOTICE TO DEFEND</u>

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

Lawyer Referral Service
Allegheny County Bar Association
400 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
Telephone: (412) 261-5555
https://www.getapittsburghlawyer.com/

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY,
PENNSYLVANIA

| | |
|---|---|
| NATALIE PIERCE and MICHELLE INGRODI, individually and on behalf of all others similarly situated, | CIVIL DIVISION |
| | No. |
| Plaintiffs, | CLASS ACTION |
| v. | |
| KLOVER HOLDING'S, INC., | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiffs Natalie Pierce and Michelle Ingrodi ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Klover Holding's Inc. ("Defendant" or "Klover"), and allege as follows:

## NATURE OF THE ACTION

1.      This action concerns a cash advance product that Defendant offers in Pennsylvania.

2.      To obtain compensation for offering this product, Defendant charges monthly fees and express fees.

3.      These charges yield triple digit APRs that routinely exceed 300%.

4.      That is far above the lawful rate allowed in Pennsylvania.

5.      Accordingly, Plaintiffs bring this action, individually and on behalf of a class of all similarly situated persons, under the Pennsylvania Loan Interest and Protection Law ("LIPL"), and the Pennsylvania Consumer Discount Company Act ("CDCA"), and Plaintiffs seek to recover all overcharges paid to Defendant, statutory damages, and attorneys' fees and costs.

1

## JURISDICTION AND VENUE

6.      The Court has subject matter jurisdiction under 42 Pa. C.S. § 931.

7.      The Court has personal jurisdiction over Defendant under 42 Pa. C.S. § 5301.

8.      Venue is proper under Pa. R. Civ. P. 2179 because Defendant regularly conducts business in this County, this is the County where a cause of action arose, and this is the County where a transaction or occurrence took place out of which a cause of action arose.

## PARTIES

9.      Natalie Pierce is a person residing in Allegheny County, Pennsylvania.

10.     Michelle Ingrodi is a person residing in Allegheny County, Pennsylvania.

11.     Klover is a technology company headquartered in Chicago, Illinois.

12.     Klover is not a bank and is not licensed under any Pennsylvania statute.

13.     Klover makes loans or advances to Pennsylvania consumers over the internet.

14.     Klover is backed by venture capitalists and experienced investors, who expect "to be paid back royally" for their investment. Tara Siegel Bernard, *Apps Will Get You Paid Early, for a Price*, N.Y. Times (Oct. 2, 2020), https://www.nytimes.com/2020/10/02/your-money/cash-advance-apps-paychecks.html.

15.     Klover investors have paid millions of dollars to Klover in hopes that Klover can evade state law compensation caps for lending money. *Data Innovator and FinTech Disruptor Klover Raises $60 Million in New Funding*, PR Newswire (Aug. 21, 2021), https://www.prnewswire.com/news-releases/data-innovator-and-fintech-disruptor-klover-raises-60-million-in-new-funding-301354005.html.

16.     Klover created the cash advance product at issue in this case in hopes of evading state law and producing a massive return for its investors

2

## FACTUAL ALLEGATIONS

*Klover's Cash Advance Product*

17.    Klover operates a lending app called "Klover."

18.    The app provides consumers with cash advances.

19.    Consumers can obtain advances of up to $200.00.

20.    Users must connect a bank account and payment card to obtain an advance.

21.    After doing so, Klover analyzes its users' bank account history using proprietary underwriting criteria to determine whether a user is eligible for an advance and the amount of an advance that a user is eligible to obtain.

22.    In practice, these criteria prevent consumers from obtaining an advance unless they have a recurring source of income directly deposited into their linked bank account.

23.    Klover currently offers a standard advance and an expedited advance.

24.    The former is deposited into a bank account a few days after it is requested.

25.    The latter is deposited into a bank account a few minutes after it is requested.

26.    Users must pay an express fee to obtain an expedited advance.

27.    That fee ranges from $1.49 to $20.78.[1]

28.    These "fees" are intended to compensate Klover for lending money; they do not cover the cost of providing other services.

29.    On top of this fee, before uses can obtain a cash advance, they must proceed past a screen that has selected a default tip.

30.    The screen does not disclose that users may avoid tips

_____

[1] It currently costs: $1.49 for a $5.00 advance; $2.99 for a $10 advance; $3.99 for a $15.00 advance; $3.99 for a $20.00 advance; $3.99 for a $25.00 advance; $5.89 for a $40.00 advance; $8.29 for a $50.00 advance; $12.29 for a $100.00 advance, and $20.78 for an advance over $100.00.

31.     Instead, users must figure out how to do so on their own to avoid paying a tip when obtaining a cash advance.

32.     Unlike Uber or DoorDash, Klover's "tip" does not go to delivery drivers trying to make ends meet; Klover's "tip" provides a profit center for a company that is already is backed by venture capitalists and highly experienced investors.

33.     Indeed, Klover's "tips," just like Klover's "fees" are intended to compensate Klover for loaning money.

34.     Klover's cash advances are repayable on a consumer's next payday.

35.     To ensure it gets paid, Klover requires its users to authorize Klover to automatically deduct its advances from the user's bank account or payment card immediately after their employer deposits a paycheck into their bank account on payday.

36.     The "fees" and "tips" associated with Klover's advances are incorporated into user repayment obligations, and users must authorize Klover to automatically deduct its cash advances, with any "fees" and "tips" immediately after a user's employer deposits a paycheck into their bank account on payday.

37.     Klover will not issue cash advances unless Klover believes that it will be able to automatically deduct its advances, and any "fees" and "tips," from a bank account immediately after a user's employer deposits a paycheck on payday.

38.     Klover's underwriting criteria, the requirement that borrowers link their accounts and payment cards to Klover's app, and Klover's requirement that users authorize Klover to deduct its cash advances and any "fees" and "tips" from bank accounts on payday, has resulted in Klover obtaining repayment on the vast majority of the advances Klover issues.

39.     On the off chance Klover fails to obtain repayment, it will not issue another cash advance until it is able to debit the prior advance and any fees.

40.     By requiring users to repay its advances, and by requiring users to allow Klover to automatically debit accounts for repayment, Klover can cause consumers to incur overdraft fees, or insufficient fund fees if a user's bank account does not have sufficient funds to repay Klover's automatic account debits.

***Klover's Cash Advance Product Is Costly***

41.     Klover advertises its cash advance product as "zero interest" product.

42.     This claim is untrue—Klover's cash advances have significant costs.

43.     For example, a $20.00 advance, with a two-week repayment schedule, and a $3.99 express fee, yields a 520.13% APR.

44.     The same advance with a 20% tip yields a 1,041.55% APR.

45.     Klover does not disclose the APRs of its cash advances before, during, or after any transaction, which allows Klover to mislead borrowers to believe its advances have no cost.

46.     The APRs associated these cash advances are similar to the APRs associated with payday loans. *See* California Department of Financial Protection and Innovation, *Initial Statement of Reasons for the Proposed Adoption of Regulations*, p. 62 (Mar. 15, 2023), *available at,* https://d fpi.ca.gov/wp-content/uploads/sites/337/2023/03/PRO-01-21-ISOR.pdf?emrc=e1ffd2 (stating the "APRs for companies [offering advances through cash advances apps] are generally similar to the average APRs for licensed payday lenders in California"); Paulina Cachero, *Popularity of Apps for Early Paydays Masks Added Risks*, Bloomberg (July 29, 2023), https://www.bloomberg.com/ news/articles/2023-06-29/know-the-risks-before-using-cash-advanc e-apps-like-earnin-dailypay (displaying the cost of payday loans versus cash advances); Grace Gedye, *The new payday loans?*

5

*California moves to regulate cash advance apps*, Cal Matters (June 5, 2023), https://calmatters.o rg/economy/2023/06/earned-wage-access/ (similar).

47.     The high fees associated with payday loans generally leave holes in the paychecks of borrowers, which leads to a cycle of reborrowing, where borrowers take out new loans to fill the gaps created by old loans. *See, e.g.*, Consumer Financial Protection Bureau, *Payday Loans and Deposit Advances Products*, pp. 21-22 (Apr. 24, 2013), *available at*, https://files.consumerfinanc e.gov/f/201304_cfpb_payday-dap-whitepaper.pdf (finding only 13% of borrowers took 2 or less payday loans in a two month period).

48.     Cash advances apps, including Klover, create these same holes and reborrowing cycles. *See, e.g.*, Paulina Cachero, *Popularity of Apps for Early Paydays Masks Added Risks*, Bloomberg (July 29, 2023), https://www.bloomberg.com/news/articles/2023-06-29/know-the-ris ks-before-using-cash-advan ce-apps-like-earnin-dailypay; (detailing cash advance app user, who "found himself trapped in a constant loop or borrowing" and felt he had "completely lost control of the situation, with no way to work it out"); Cyrus Farivar, *Millions use Earnin to get cash before payday. Critics say the app is taking advantage of them*, NBC News (July 26, 2019), https:// www.nbcnews.com/tech/internet/millions-use-earnin-get-cash-payday-critics-say-app-taking-n10 34071 (detailing cash advance app user who described the app as a "vicious cycle" and "had no money" after paying tips and fees); Sidney Fussell, *The New Payday Lender Looks a Lot Like the Old Payday Lender*, The Atlantic (Dec. 18, 2019), https://www.theatlantic.com/technology/arch ive/2019/12/online-banking-lending-earnin-tip/603304/ (detailing cash advance app user who fell into a "cycle of get paid and borrow, get paid and borrow").

49.     Despite Klover's cash advances being just as costly as payday loans, Klover obtains repayment of its advances, along with fees that yield triple digit APRs and are intended to provide

Klover compensation for lending money, at a rate of at least 97%. *See* Financial Health Network, Earned Wage Access and Direct-to-Consumer Advance Usage Trends, p. 2 (April 2021), *available at*, https://cfsi-innovation-files-2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190749/EWA_D2C_Advance-_sage_Trends_FINAL.pdf.

50.     This rate "significantly" exceeds that of payday lenders. *See* California Department of Financial Protection and Innovation, *Initial Statement of Reasons for the Proposed Adoption of Regulations*, pp 24-25 (Mar. 15, 2023), *available at*, https://dfpi.ca.gov/wp-content/uploads/sites/337/2023/03/PRO-01-21-ISOR.pdf?emrc=e1ffd2

51.     Despite receiving amounts that are just as costly as those charged for a payday loan, and despite receiving those costly charges on virtually every cash advance that it issues, Klover, unlike payday lenders, never discloses the cost of its advances in terms of APR.

52.     This results in borrowers failing to understand the true cost of Klover's advances. *See, e.g.,* Cyrus Farivar, *Millions use Earnin to get cash before payday. Critics say the app is taking advantage of them*, NBC News (July 26, 2019), https://www.nbcnews.com/tech/internet/millions-use-earnin-get-cash-payday-critics-say-app-tak ing-n1034071 (discussing user unaware that cash advance app had triple digit APRs); Laurence Dermiento, *His app lends money for free. But it will probably cost you*, LA Times (May 18, 2022), https://www.latimes.com/business/story/2022-05-18/dave-inc-jason-wilk-cash-advance-app (same).

***Klover's Lending Practices Harm Pennsylvania Consumers***

53.     Klover's advances are no different than payday loans.

54.     Payday loans generally are "balloon" loans, which means the principal a consumer receives, along with any fee or other amount a consumer is scheduled to pay, are repaid in a single installment, generally on payday.

7

55.     The compensation payday lenders receive for making loans generally reaches triple digits in terms of APR.

56.     As explained above, Klover's advances function as "balloon" loans as well, and Klover similarly receives costly compensation for making advances.

57.     Klover's advances, however, are worse than payday loans in at least two respects.

58.     First, unlike payday lenders, Klover deceptively brands its cash advances as "zero interest," and fails to inform consumers about the cost of its cash advances in terms of APR, which prevents consumers from understanding what they are paying.

59.     This also takes advantage of the public's lack of awareness of how fees can add up, which results in a detrimental cycle of debt and incentivizes poor money management habits.

60.     Second, unlike payday lenders, Klover is more successful in taking its triple digit APR compensation from borrower's bank accounts, and Klover does so at a rate of at least 97%. *See* Financial Health Network, Earned Wage Access and Direct-to-Consumer Advance Usage Trends, p. 2 (April 2021), *available at*, https://cfsi-innovation-files-2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190 749/EWA_D2C_Advance-_sage_Trends_FINAL.pdf.

61.     That means Klover's users are far more likely to have amounts that yield triple digit APRs deducted from their bank accounts than borrowers that visit traditional payday lenders.

62.     By taking fees that yield triple digit APRs from user's accounts with a 97% success rate, and by failing to disclose the cost of its cash advances with a recognizable metric—like APR—Klover is trapping Pennsylvanians in a detrimental "cycle of get paid and borrow, get paid and borrow." Sidney Fussell, *The New Payday Lender Looks a Lot Like the Old Payday Lender*, The Atlantic (Dec. 18, 2019), https://www.theatlantic.com/technology/archive/2019/12/ online-banking-lending-earnin-tip/603304/.

***Klover's Lending Practices Are Unlawful***

63.     The Commonwealth of Pennsylvania "has a long history, dating back to colonial times, of outlawing annual interest rates above 6%." *Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 329 (3d Cir. 2022).

64.     Today, that history is codified in the LIPL, which sets the maximum rate of interest at 6% for the loan or use of money. 41 P.S. § 201(a).

65.     The CDCA provides an exception, and allows those licensed under the CDCA to charge, collect, contract for, and receive interest and fees that yield APRs between 24% and 29% (depending on the term and size of the loan and the interest, fees, or other amounts licensed lenders impose or receive). 7 P.S. §§ 6213, 6217.1.

66.     At the same time, the CDCA prohibits unlicensed persons that make or negotiate loans or advances of money or credit from charging, collecting, contracting for, or receiving any interest, fees, or other amounts that, in the aggregate, exceed 6%. 7 P.S. § 6203.A; *see also Lutz*, 49 F.4th at 329 (citing 7 P.S. § 6203.A and 41 P.S. § 201(a)).

67.     Klover is not a CDCA licensee, which means it cannot charge, collect, contract for, or receive interest, fees, or other amounts that exceed 6%, yet Klover does just that.

68.     And even if Klover held a CDCA license, its cash advances would still be illegal because all of Klover's cash advances have triple digit APRs, which far exceed the 24% to 29% APRs allowed for CDCA licensees.

***Klover Cannot Evade Pennsylvania Law***

69.     Klover may claim its "fees" and "tips" do not qualify as "interest" because they are voluntary, but "[t]he payment of usurious interest is usually voluntary[.]" *Marr v. Marr*, 20 A. 592, 593 (Pa. 1885); *Stock v. Meek*, 221 P.2d 15, 20 (Cal. 1950) ("The theory of [a usury] law is that

society benefits by the prohibition of loans at excessive interest rates, even though both parties are willing to negotiate them. Accordingly, 'voluntary' payments of interest do not waive the rights of the payors.")

70.     Further, interest is defined as "compensation . . . for the use . . . of money." *Interest*, Black's Law Dictionary, p. 816 (7th ed. 1999).

71.     Klover's "fees" and "tips" qualify as interest because they compensate Klover for the use of money.

72.     Further, even if Klover's "fees" and "tips" did not qualify as interest, they still are prohibited because Pennsylvania law regulates any fee, charge, cost, or other amount charged, collected, contracted for, or received on a loan or advance of money or credit, or collected for the loan or use of money. 7 P.S. § 6203; 41 P.S. § 502.

73.     Moreover, Pennsylvania law regulates fees, charges, and other amounts regardless of whether any fee, charge, or other amount is charged, collected, contracted for, or received on the amount loaned or advanced. *Dep't of Banking v. NCAS of Del., LLC*, 948 A.2d 752, 760-62 (Pa. 2008) (applying the CDCA to monthly membership fees); *Roethlein v. Portnoff Law Assocs., Ltd.*, 81 A.3d 816, 825 (Pa. 2013) (recognizing the LIPL provides cause of action for "costs . . . incurred in connection with the loan or use of money"); *see also Glover v. Udren Law Offices, P.C.*, 139 A.3d 195, 197 (Pa. 2016) (finding a consumer could bring action under the LIPL for "unearned and excessive attorney's fees").

74.     Klover also may argue that it can evade Pennsylvania law because its advances do not qualify as "loans," "advances," or "the loan or use of money."

75.     These arguments should be rejected as well.

10

76.     "Loan" is defined as a "thing lent for the borrower's temporary use." *Loan*, Black's Law Dictionary, p. 947 (7th ed. 1999).

77.     "Advance" is defined as "money or goods furnished." *Advance*, Black's Law Dictionary, p. 53 (7th ed. 1999).

78.     Because Klover's advances are money furnished, they are "advances."

79.     Those advances also are "loans" because they are money lent for temporary use.

80.     Klover is a for profit company that advances cash to borrowers fully expecting its borrowers to repay the advance and fees in return for the privilege of obtaining the advance.

81.     Indeed, Klover structured its business specifically to obtain repayment: before borrowers obtain advances, Klover evaluates its ability to obtain repayment by automatically withdrawing funds from bank accounts; borrowers must link their accounts and allow Klover to automatically withdraw funds to obtain repayment; and Klover issues only one advance at a time, and will not issue additional advances until prior advances are repaid.

82.     Further, despite its advances being just as costly as (if not more costly than) payday loans, Klover obtains repayment of its advances at least 97% of the time, which significantly exceeds the rate at which other payday lenders receive payment.

83.     Klover cannot evade Pennsylvania law by attempting to call its cash advances and fees something they are not. *Simpson v. Penn Disc. Corp.*, 5 A.2d 796, 798 (Pa. 1939) (citations and quotation marks omitted) ("The statute against usury forms a part of the public policy of the state and cannot be evaded by any circumvention or waived by the debtor[.] It is immaterial in what form or pretence the usurious interest is covered in the contract[.] As usury is generally accompanied by subterfuge and circumvention of one kind or another to present the color of legality, it is the duty of the court to examine the substance of the transaction as well as its form

. . . [.] It is, indeed, wholly immaterial under what form or pretence usury is concealed, if it can by any means be discovered our courts will refuse to enforce its payment."); *see, e.g., Walnut Disc. Co. v. Weiss*, 208 A.2d 26, 28 (Pa. Super. 1965); *Saunders v. Resnick*, 16 A.2d 676 (Pa. Super. 1940); *Moll v. Lafferty*, 153 A. 557, 558-59 (Pa. 1931); *see also Scott v. Lloyd*, 34 U.S. 418, 446-47 (1835) ("The ingenuity of lenders has devised many contrivances, by which, under forms sanctioned by law, the [usury] statute may be evaded. . . . Yet it is apparent, that if giving this form to the contract will afford a cover which conceals it from judicial investigation, the [usury] statute would become a dead letter. Courts, therefore, perceived the necessity of disregarding the form, and examining into the real nature of the transaction."); *Pope v. Marshall*, 4 S.E. 116, 118 (Ga. 1887) ("The theory that a contract will be usurious or not according to the kind of paper-bag it is put up in, or according to the more or less ingenious phrases made use of in negotiating it, is altogether erroneous."); *Carter v. Brand*, 1 N.C. 255, 257 (1800) ("Every case arising . . . to restrain excessive usury must be viewed in all its circumstances, so as to ascertain the real intention of the parties. If that be corrupt in the substance and design, no pretext however plausible, no contrivance however specious, no coloring however artful, with which the transaction is veiled, will secure it from the censure of the law."); *Taylor v. Salary Purchasing Co.*, 218 S.W. 2d 571, 573 (Mo. 1949) ("[R]espondent did not intend to donate . . . the . . . money which it advanced[.] . . . It intended to create the relation of debtor and creditor. It intended to collect the money so advanced and, whenever possible, it did collect the same with usurious interest.").

84. The Pennsylvania Legislature passed the LIPL and CDCA specifically to prevent Klover's scheme. *Smith v. Mitchell*, 616 A.2d 17, 20 (Pa. Super. 1992) (stating that the purpose of LIPL is "to protect the citizenry of this Commonwealth from being exploited at the hands of

unscrupulous individuals seeking to circumvent the law at the expense of unsuspecting borrowers who may have no other avenue to secure financial backing").

***Facts Relevant to Plaintiffs***

85.     Plaintiffs obtained cash advances from Klover, and used those cash advances for personal, family, and/or household purposes.

86.     Plaintiffs paid Klover's express fees and tips.

87.     Plaintiffs did not know they were paying interest by paying fees and tips.

88.     Klover's fees and tips yielded triple- and quadruple-digit APRs.

89.     Plaintiffs were unaware that the amounts they paid yielded triple- and quadruple-digit APRs, and Klover failed to disclose this fact.

## CLASS ACTION ALLEGATIONS

90.     Plaintiffs bring this action individually and on behalf of all others similarly situated under Rules 1702, 1708, and 1709 of the Pennsylvania Rules of Civil Procedure.

91.     Plaintiff seeks to certify the following class: "All persons who reside in Allegheny County and obtained an advance or loan from Defendant within the statute of limitations."

92.     Plaintiff reserves the right to expand, narrow, or otherwise modify the class as the litigation continues and discovery proceeds.

93.     Pa. R. Civ. P. 1702(1), 1708(a)(2): The class is so numerous that joinder of the class members is impracticable. Since each of the claims of the class members is substantially identical, and the class members request substantially similar relief, centralizing the class members' claims in a single proceeding likely is the most manageable litigation method available.

94.     Fed. R. Civ. P. 23(a)(2), (b)(3): Plaintiff and the class members share numerous common questions of law and fact that will drive the resolution of the litigation and predominate

over any individual issues. For example, there is a single common answer to whether Defendant's advances qualify as "loans" or "advances" under the relevant laws, and whether the "fees" and "tips" Plaintiff paid qualify as "interest" or other amounts under the laws at issue. These common questions, and other questions of law and fact, will predominate over individual questions, to the extent any individual questions exist.

95.     Pa. R. Civ. P. 1702(3): Plaintiff's claims are typical of the claims of the class because the claims of Plaintiff and the class are based on the same legal theories and arise from the same conduct.

96.     Pa. R. Civ. P. 1702(4), 1709: Plaintiff is an adequate representative of the class because the interests of Plaintiff and the class members align. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the class and has no interest antagonistic to the class. Plaintiff retained counsel who are competent and experienced in the prosecution of class action litigation generally and consumer finance and credit litigation specifically.

97.     Pa. R. Civ. P. 1708(a)(3), (6), (7): Given the complexity and nature of the issues presented and the relief requested, the expense and time necessary to obtain such relief, and the anticipated recovery and relief Plaintiff and the class members may obtain, the class action mechanism is by far the preferred and most efficient litigation mechanism to adjudicate the claims of Plaintiff and the class members. Additionally, requiring Plaintiff and the class members to file individual actions would impose a crushing burden on the court system and almost certainly lead to inconsistent judgments. Class treatment presents far fewer management difficulties and provides benefits of a single adjudication and economies of scale.

98.     Pa. R. Civ. P. 1708(a)(4): Based on the knowledge of Plaintiff and undersigned counsel, there are no cases currently pending that seek to represent the same class defined herein, or seek the same relief on behalf of that class.

99.     Pa. R. Civ. P. 1708(a)(5): This forum is appropriate for this litigation, as Defendant regularly conducts business in this County.

**COUNT I**
**Violation of the Loan Interest and Protection Law**
**41 P.S. §§ 101, et seq.**

100.    This claim is brought individually and on behalf of the class.

101.    Plaintiff and the class members are persons who paid a rate of interest in excess of that provided for by the LIPL and CDCA, and who paid charges prohibited or in excess of those allowed by the LIPL and CDCA.

102.    Defendant collected from Plaintiff and the class members interest in excess of that provided for by the LIPL and CDCA, and charges prohibited or in excess of those allowed by the LIPL and CDCA.

103.    The LIPL provides for, among other things, damages, declaratory and injunctive relief, and attorneys' fees and costs. 41 P.S. §§ 501, 502, 503.

104.    Accordingly, the Court should issue an order: awarding any excess interest, fees, or other charges collected by Defendant; awarding triple the amount of any excess interest, fees, or other charges collected by Defendant; awarding attorneys' fees and costs; and awarding all other relief that is necessary and proper.

## COUNT II
### Violation of the Consumer Discount Company Act
### 7 P.S. §§ 6201, *et seq.*

105.    This claim is brought individually and on behalf of the class.

106.    Defendant is in the business of negotiating, making, or arranging loans or advances, is not a bank, and is not licensed under any Pennsylvania statute.

107.    Consequently, Defendant cannot charge, collect, contract for, or receive more than 6% combined interest, fees, or other charges on loans or cash advances issued in amounts under $25,000. 7 P.S. § 6203; 41 P.S. § 201(a).

108.    Defendant, however, charged, collected, contracted for, or received interest, fees, or other charges above this amount.

109.    Equitable relief is available to private parties under the CDCA. *Mellish v. CACH, LLC*, No. 19-cv-01217, 2020 U.S. Dist. LEXIS 52383, at *7 (W.D. Pa. Mar. 26, 2020) ("If a private civil litigant seeks enforcement of the CDCA, the available remedy is equitable[.]").

110.    Accordingly, the Court should issue an order: awarding restitution in the amount of any interest, fees, or other amounts that Defendant charged, collected, contracted for, or received in excess of 6%; awarding attorneys' fees and costs; and awarding all other relief that is necessary and proper.

### JURY TRIAL DEMANDED

Plaintiffs request a jury trial on all claims so triable.

16

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

a.    An order certifying the proposed class, appointing Plaintiffs as representatives of the proposed class, and appointing undersigned counsel as counsel for the proposed class;

b.    An order awarding actual, statutory, treble, and all other damages available by law, along with pre- and post-judgment interest;

c.    An order providing Plaintiffs and the class members restitution for any interest, fees, or other charges that were paid to Defendant and that aggregated in excess of 6%;

d.    An order awarding attorneys' fees and costs;

e.    An order declaring Defendant's conduct unlawful; and

f.    An order awarding all other relief that is just, equitable, and appropriate.

Respectfully Submitted,

Dated: April 3, 2024                    By:    */s/ Kevin Abramowicz*
                                               Kevin Abramowicz
                                               Kevin Tucker
                                               Chandler Steiger
                                               Stephanie Moore
                                               **East End Trial Group LLC**
                                               6901 Lynn Way, Suite 215
                                               Pittsburgh, PA 15208
                                               Tel: (412) 223-5740
                                               Fax: (412) 626-7101
                                               kabramowicz@eastendtrialgroup.com
                                               ktucker@eastendtrialgroup.com
                                               csteiger@eastendtrialgroup.com
                                               smoore@eastendtrialgroup.com

                                               *Attorneys for Plaintiffs*

## **VERIFICATION**

I, Kevin Abramowicz, attorney for Plaintiff, am fully familiar with the facts set forth in this Complaint and am authorized to make this Verification. I verify that the averments contained in this Complaint are true and correct to the best of my knowledge, information, and belief. Plaintiff's verification shall be substituted for this attorney verification upon request. I understand any false statements herein are made subject to the penalties of 18 Pa. C.S § 4904, relating to unsworn falsification to authorities.

Respectfully submitted,

Dated: April 3, 2024                    By:    */s/ Kevin Abramowicz*
                                                Kevin Abramowicz

18

Allegheny County

4/4/24, 11:39 AM

## Allegheny County Department Of Court Records

Civil/Family Division Docket Report

**Run Date and Time: 4/4/2024 - 11:39:39**

| GD-24-003757 | | Ingrodi etal vs Klover Holdings Inc. |
|---|---|---|
| Filing Date: | 4/3/2024 | Case Type: | Other Tort |
| Related Cases: | | Court Type: | General Docket |
| Consolidated Cases: | | Current Status: | Complaint |
| Judge: | No Judge | Jury Requested: | N |
| Amount In Dispute: | $ 0 | | |

| --Parties-- | | | | | |
|---|---|---|---|---|---|
| LName | FName | MI | Type | Address | Initial Service Completion | Attorney |
| Ingrodi | Michelle | | Plaintiff | | -- | Kevin J. Abramowicz |
| Pierce | Natalie | | Plaintiff | | -- | Kevin J. Abramowicz |
| Klover Holdings Inc. | | | Defendant | | -- | -- |

| --Attorney-- | | | | | |
|---|---|---|---|---|---|
| LName | FName | MI | Type | Address | Phone |
| Tucker | Kevin | W. | Plaintiff's Attorney | 6901 Lynn Way Suite 215 Pittsburgh PA 15208 | 4122235740 |
| Steiger | Chandler | | Plaintiff's Attorney | 6901 Lynn Way Suite 215 Pittsburgh PA 15208 | 4122235740 |
| Moore | Stephanie | | Plaintiff's Attorney | 6901 Lynn Way Suite 215 Pittsburgh PA 15208 | 4122235740 |
| Abramowicz | Kevin | J. | Plaintiff's Attorney | 6901 Lynn Way Suite 215 EAST END TRIAL GROUP LLC Pittsburgh PA 15208 | 4122235740 |

| --Non Litigants-- | | | | | |
|---|---|---|---|---|---|
| LName | FName | MI | Type | Address | Phone |
| No Litigants Found | | | | | |

| --Docket Entries-- | | | |
|---|---|---|---|
| Filing Date | Docket Type | Docket Text | Filing Party |
| 4/3/2024 | Complaint | | Natalie Pierce |

| --Judgments Against-- | | |
|---|---|---|
| Name | Amount | Satisfied(Y,N) |
| No Judgments Found | | |

| --Events Schedule-- | | | |
|---|---|---|---|
| Event Scheduled | Event Date & Time | Room Number | Judge/Hearing Officer |

Allegheny County

4/4/24, 11:39 AM

**No Information Found**